ORIGINAL

Approved: _____
DAVID ABRAMOWICZ, JILAN KAMAL, and MICHAEL McGINNIS
Assistant United States Attorneys

Before:   HONORABLE DEBRA FREEMAN
          United States Magistrate Judge
          Southern District of New York

19 MAG 7429

- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA          :        **SEALED COMPLAINT**

          - v. -                  :        Violations of
                                           18 U.S.C § 1349.
MICHAEL SOLOMON MARKOWITZ,        :
     a/k/a "Sol,"                          COUNTY OF OFFENSE:
DAVID BINET, and                  :        NEW YORK
ULYSSES SMITH,
     a/k/a "Malick,"              :

          Defendants.             :

- - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

        NICHOLAS J. SWANSON, being duly sworn, deposes and says
that he is a Special Agent with the Federal Bureau of
Investigation ("FBI"), and charges as follows:

COUNT ONE
(Conspiracy to Commit Wire Fraud)

        1.    From at least in or about 2012 up to and
including in or about 2019, in the Southern District of New York
and elsewhere, MICHAEL SOLOMON MARKOWITZ, a/k/a "Sol," DAVID
BINET, and ULYSSES SMITH, a/k/a "Malick," the defendants, and
others known and unknown, willfully and knowingly, did combine,
conspire, confederate, and agree together and with each other to
commit wire fraud, in violation of Title 18, United States Code,
Section 1343.

        2.    It was a part and object of the conspiracy that
MICHAEL SOLOMON MARKOWITZ, a/k/a "Sol," DAVID BINET, and ULYSSES
SMITH, a/k/a "Malick," the defendants, and others known and
unknown, willfully and knowingly, having devised and intending
to devise a scheme and artifice to defraud, and for obtaining

money and property by means of false and fraudulent pretenses,
representations, and promises, for the purpose of executing such
scheme and artifice and attempting so to do, would and did
transmit and cause to be transmitted by means of wire, radio,
and television communication in interstate and foreign commerce,
writings, signs, signals, pictures, and sounds for the purpose
of executing such scheme and artifice, in violation of Title 18,
United States Code, Section 1343, to wit, MARKOWITZ, BINET, and
SMITH participated in a scheme to obtain and steal advance fees
provided by victims in exchange for fraudulent standby letters
of credit, and executed such scheme through the use of
interstate wires, including emails and telephone calls.

(Title 18, United States Code, Section 1349.)

## COUNT TWO
(Conspiracy to Commit Bank Fraud)

3.     From at least in or about 2012 up to and
including in or about 2019, in the Southern District of New York
and elsewhere, MICHAEL SOLOMON MARKOWITZ, a/k/a "Sol," the
defendant, and others known and unknown, willfully and
knowingly, did combine, conspire, confederate, and agree
together and with each other to commit bank fraud, in violation
of Title 18, United States Code, Section 1344.

4.     It was a part and object of the conspiracy that
MICHAEL SOLOMON MARKOWITZ, a/k/a "Sol," the defendant, and
others known and unknown, willfully and knowingly, would and did
execute and attempt to execute a scheme and artifice to defraud
a financial institution, the deposits of which were then insured
by the Federal Deposit Insurance Corporation, and to obtain
moneys, funds, credits, assets, securities, and other property
owned by, and under the custody and control of, such financial
institution, by means of false and fraudulent pretenses,
representations, and promises, in violation of Title 18, United
States Code, Section 1344, to wit, MARKOWITZ participated in a
scheme to provide fraudulent standby letters of credit and
proof-of-fund letters to financial institutions whose deposits
were then insured by the FDIC.

(Title 18, United States Code, Section 1349.)

The bases for my knowledge and the foregoing charges are,
in part, as follows:

5.     I am a Special Agent with the FBI and I have been
personally involved in the investigation of this matter.  I have

2

been a Special Agent with the FBI for approximately 4 years, and have participated in previous investigations involving complex financial frauds, including wire fraud and bank fraud.   This affidavit is based upon my own observations, conversations with witnesses and other law enforcement agents, and my examination of reports and records prepared by others.   Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts I have learned during the course of this investigation.   Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

### Overview

6.   Based on my training, experience, and participation in this investigation, I have learned, among other things, that standby letters of credit ("SBLCs") are financial instruments that provide a bank's commitment of payment to a third party in the event that the bank's client defaults on an agreement with the third party.   An SBLC is a "standby" agreement because the bank will have to pay only in a worst-case scenario where the client defaults on an ongoing agreement. Fraudulent SBLCs are frequently used in advanced-fee schemes wherein victims provide funds up front in exchange for the promise of an SBLC.

7.   As set forth in further detail below, MICHAEL SOLOMON MARKOWITZ, a/k/a "Sol," DAVID BINET, and ULYSSES SMITH, a/k/a "Malick," the defendants, participated in a scheme to obtain and steal advance fees paid by or on behalf of individuals or businesses ("Advance-Fee Victims") seeking SBLCs that would enable the Advance-Fee Victims to borrow significantly larger sums from financial institutions.   Advance-Fee Victims or their representatives have negotiated with and/or provided the fees to, among others, MARKOWITZ, BINET, SMITH, and one or multiple businesses associated with each defendant (the "MARKOWITZ Business," the "BINET Business," and the "SMITH Business").   After collecting the advance fees, the defendants either never provided any SBLC, or they provided fraudulent SBLCs that were not issued by legitimate financial institutions.

8.   MICHAEL SOLOMON MARKOWITZ, a/k/a "Sol," the defendant, also participated in a scheme to provide fraudulent financial instruments, including purported SBLCs prepared for Advance-Fee Victims, to banks (the "Bank Victims") where potential borrowers were seeking financial services.

3

## Civil Complaints

9.   Based on my review of court records, I have
learned, among other things, the following:

a.   In or about 2013, a civil complaint (the
"2013 Civil Complaint") was filed in United States District
Court in the Eastern District of New York against, among others,
MICHAEL SOLOMON MARKOWITZ, a/k/a "Sol," the defendant, and the
MARKOWITZ Business.   The plaintiff who filed the 2013 Civil
Complaint (the "2013 Plaintiff") alleged that the defendants
committed fraud and other civil offenses.   Specifically, the
2013 Civil Complaint alleged that the defendants perpetrated "an
'advance fee scheme'" in which MARKOWITZ and the MARKOWITZ
Business, in or about January 2012, claimed "that [the MARKOWITZ
Business] had the ability to procure for [the 2013 Plaintiff]
Standby Letters of Credit . . . in the total amount of $24
million" if the 2013 Plaintiff provided an initial and advance
payment of $350,000.   According to the 2013 Civil Complaint, the
2013 Plaintiff paid the $350,000 fee to an escrow attorney who
then wrongfully disbursed most of that amount to, among others,
MARKOWITZ and DAVID BINET, the defendant; no standby letter of
credit was ever provided; and by fall of 2012, the defendants
had stopped responding to the 2013 Plaintiff's demands for a
full refund.   On or about July 20, 2016, the court action was
dismissed after the 2013 Plaintiff filed a stipulation of
dismissal stating that the matter had been settled.

b.   In or about 2015, a civil complaint (the
"2015 Civil Complaint") was filed in United States District
Court in the Eastern District of New York against the MARKOWITZ
Business.   The plaintiff who filed the 2015 Civil Complaint (the
"2015 Plaintiff") alleged that the MARKOWITZ Business received
approximately $435,000 from the 2015 Plaintiff in or about
September 2014, in exchange for a standby letter of credit or
bank guarantee. According to the 2015 Civil Complaint, however,
the MARKOWITZ Business did not provide the standby letter of
credit or bank guarantee, and did not return the 2015
Plaintiff's money as required.   In or about April 2016, the
Honorable Allyne R. Ross, United States District Judge, Eastern
District of New York, entered an Order of Default Judgment
against the MARKOWITZ Business and awarded the 2015 Plaintiff
approximately $435,000 in damages and approximately $58,885.74
in pre-judgment interest.

4

## Transactions with Advance-Fee Victim-1

10.    Based on an interview with an individual
("Individual-1") who controls a particular business ("Advance-
Fee Victim-1"), email communications obtained pursuant to a
search warrant for email accounts from the BINET Business and
the MARKOWITZ Business ("Email Search Warrant-1"),[1] and bank
records, I have learned, among other things, the following:

a.    In or about early August 2017, Individual-1
agreed on behalf of Advance-Fee Victim-1 to send the BINET
Business an advance fee of $100,000 in exchange for a standby
letter of credit.   Individual-1 negotiated the transaction with
DAVID BINET, the defendant, communicated about it via email with
BINET and ULYSSES SMITH, a/k/a "Malick," the defendant, and
understood that an individual named "Sol" was also involved in
the deal.

b.    On or about August 2, 2017, BINET emailed
Individual-1 various documents signed by BINET on behalf of the
BINET Business.   The documents included an agreement with the
heading "RE: 1 Year 1M SBLC," as well as a letter to Advance-Fee
Victim-1.   The letter stated that "we will provide project
financing in the amount of 70% LTV of the 1M LC to [Advance-Fee
Victim-1]"; that "[t]he funds will be secured with a Standby
Letter of Credit issued by" a particular bank; that "[w]e will
begin the process of securing the Standby Letter of Credit once
[Advance-Fee Victim-1] provides $100,000 USD to us to initiate
the transaction"; and that "[i]n the event we are not able to
complete the transaction outlined within this document, we will
return the funds to [Advance-Fee Victim-1]."

c.    On or about August 3, 2017, BINET emailed
Individual-1 additional documents.   One document attached to the
email was identified as a "Letter of Intent" dated August 2,
2017, and signed by BINET on behalf of the BINET Business.   The
Letter of Intent, which was addressed to the attention of
Advance-Fee Victim-1, with a carbon copy to the MARKOWITZ
Business, stated that "we are ready, willing and able to lease
. . . a cash-backed collateral instrument" in the amount of
"€1,000,000.00."   Another document attached to the email was
identified as a "Collateral Monetization Agreement" dated August
2, 2017, between Advance-Fee Victim-1, which was identified as

---

[1] Email Search Warrant-1 was signed by the Honorable Kevin
Nathaniel Fox, United States Magistrate Judge, Southern District
of New York, on or about September 10, 2018.

5

"the collateral provider," and an unspecified "funder."
Individual-1 signed and returned the documents to BINET via
email.

             d.    At Individual-1's direction, approximately
$100,000 was wired from a specific bank account ("Individual-1's
Bank Account") to a bank account held by the BINET Business at a
bank located in New Jersey ("BINET Business Account-1") on or
about August 3, 2017. Before that wire transfer, BINET Business
Account-1 had a balance of approximately $220.94. No other
investor funds were deposited into BINET Business Account-1 from
on or about August 3, 2017, through on or about October 17,
2017.

             e.    On or about August 4, 2017, BINET wired
approximately $15,000 from BINET Business Account-1 to an
account held by SMITH. Over the next approximately two months,
BINET transferred an additional approximately $10,100 from BINET
Business Account-1 to SMITH, and spent an additional
approximately $42,000 from BINET Business Account-1 by writing
checks payable to BINET. On or about October 17, 2017, BINET
Business Account-1 had a balance of approximately $170.96.

             f.    Advance-Fee Victim-1 did not receive a cash-
backed collateral instrument. On or about September 14, 2017,
Individual-1 emailed BINET a letter from Advance-Fee Victim-1
demanding the return of the $100,000 payment.

             g.    On or about September 28, 2017, BINET stated
in an email to Individual-1, "Your funds are being returned to
you it should be done today the latest by Monday."

             h.    The $100,000 payment had not been refunded
as of October 7, 2017. That day, SMITH sent BINET an email
listing three numbered items that SMITH wrote "must be" "our
main focus." The first numbered item referred to an individual
("Individual-2") who, as discussed in further detail in
paragraphs 11 and 12 below, had been communicating with BINET,
SMITH, and MICHAEL SOLOMON MARKOWITZ, a/k/a "Sol," the
defendant, about obtaining financing for a client. SMITH wrote
of Individual-2, "ready $250K 4 U," and "$100-M-SBLC they are
ready to do the paperwork." The second numbered item referred
to someone being "ready to do paper work" related to "$120-M,"
and stated, "He has $150-K." The third numbered item simply
listed a name followed by multiple question marks. After the
three numbered items, SMITH wrote, "These are a must !!!! This
will pay [Individual-1] soonest."

6

i.     In or about November 2017, over the course
of three separate transfers, BINET wired $100,000 from BINET
Business Account-1 to another account at Individual-1's
direction to repay the $100,000 fee.  As discussed in paragraphs
11-13 below, the funds for that refund were taken from the
advance fee paid by a victim working with Individual-2.

### Transactions with Advance-Fee Victim-2

11.    Based on interviews with Individual-2 and an
individual ("Individual-3") employed at a particular business
("Advance-Fee Victim-2"), as well as bank records, documents
provided by Individual-2 and Individual-3, and email
communications obtained pursuant to Email Search Warrant-1, I
have learned, among other things, the following:

a.     Beginning in or about September 2017,
Individual-2, on behalf of a particular business (the
"Individual-2 Business"), sought to help Individual-3, acting on
behalf of Advance-Fee Victim-2, obtain financing related to an
oil and gas project in Africa.  Individual-2 discussed the
efforts to obtain financing for Individual-3 and Advance-Fee
Victim-2 with ULYSSES SMITH, a/k/a "Malick," the defendant, who
had previously interacted professionally with Individual-2.
SMITH recommended that Individual-2 contact DAVID BINET, the
defendant, of the BINET Business.  SMITH stated that he had
worked with BINET on similar transactions that were completed
successfully, and that BINET and the BINET Business were
reliable.  Accordingly, Individual-2 contacted BINET.

b.     On or about October 9, 2017, Individual-2
emailed BINET, copying SMITH, among others.  The message stated,
"The first project for which we need an unconditional SBLC is
for Marine assets doing contract work in Gulf of Guinea in the
oil and gas sector[.]  According to the funding investor, we
require an SBLC for value of $100 million.  Could you kindly
send us your an outline of what your requirements are for
raising the SBLC so we can proceed to the next step."  In
response, BINET emailed Individual-2 a proposed agreement
between Individual Business-2 and the BINET Business.  According
to the proposed agreement, Individual Business-2 would pay the
BINET Business approximately $500,000 in exchange for a "Bank
Guarantee" in the amount of approximately $100 million that the
BINET Business would obtain from another entity ("Entity-1").

c.     On or about November 10, 2017, the
Individual-2 Business entered into an agreement with the BINET

7

Business.  BINET signed the agreement on behalf of the BINET
Business, and the agreement listed BINET's title as "Managing
Member."  Pursuant to the agreement, the Individual-2 Business
agreed to deposit approximately $450,000 with the BINET
Business, which, in return, would obtain a standby letter of
credit from the MARKOWITZ Business in the amount of
approximately $14 million.  The agreement called for the amount
paid by the Individual-2 Business to be refunded in the event
the desired SBLC was not issued or accepted within 14 calendar
days of the date the $450,000 was deposited.

            d.  On or about November 10, 2017, the
Individual-2 Business wired approximately $450,000 to BINET
Business Account-1.  Immediately before that wire transfer,
BINET Business Account-1 held a balance of approximately $46.70.
Individual-3 had provided the funds for the wire transfer by
first causing approximately $462,500 to be wired from a bank in
New York, New York, to a bank in Jacksonville, Florida, on or
about November 9, 2017.  (The Individual-2 Business retained
approximately $12,500 of that amount as reimbursement for a
separate transaction.)

            e.  Shortly after approximately $450,000 was
transferred to BINET Business Account-1, a portion of that money
was transferred to accounts associated with SMITH.  On or about
November 13, 2017, approximately $12,500 was wired from BINET
Business Account-1 to a bank account held by the SMITH Business.
Bank records from that transfer described the purpose of the
transaction as "COMMISSION," and an entry in the "REFERENCE /
FFC TO" section of transfer documents stated, "MALICK," a name
used by SMITH.[2]  On or about November 14, 2017, an additional
approximately $7,500 was wired from BINET Business Account-1 to
the SMITH Business's bank account.  Bank records from that
transfer described the purpose of the transaction as
"COMMISSION," and an entry in the "REFERENCE / FFC TO" section
of transfer documents also stated, "COMMISSION."  From on or
about November 22, 2017, to on or about December 8, 2017, a
total of approximately $2,225 was wired from BINET Business
Account-1 to a bank account held by SMITH in three transactions.
Bank records from those transfers described the purpose of those
transactions as "COMMISSION."  In or about the spring of 2018,
Individual-2 asked SMITH whether SMITH had received any money

_____

[2] Based on my review of a social media account in or about July
2019, I have learned that SMITH was listed as the CEO of the
SMITH Business since approximately November 2017 on the social
media account.

8

related to the transactions involving the Individual-2 Business and the BINET Business.  SMITH responded that he had been paid by the BINET Business only in connection with janitorial work, not for any reason related to the transactions with the Individual-2 Business.  SMITH's statement to Individual-2 is inconsistent with the wire transfers discussed above, including transfers to SMITH for payment of "COMMISSION."

f.   Similarly, a portion of the approximately $450,000 that was transferred to BINET Business Account-1 on or about November 10, 2017, was transferred to an account associated with MICHAEL SOLOMON MARKOWITZ, a/k/a "Sol," the defendant.  Specifically, on or about November 14, 2017, approximately $275,000 was wired from BINET Business Account-1 to an account held by the MARKOWITZ Business at a bank located in Brooklyn, New York ("MARKOWITZ Business Account-1").

g.   In or about November 2017, over the course of three transactions, approximately $100,000 was wired from BINET Business Account-1 to another bank account at Advance-Fee Victim-1's direction as repayment of the $100,000 fee provided to BINET on or about August 3, 2017.

h.   On or about November 30, 2017, Individual-2 sent BINET an email demanding that the BINET Business refund the approximately $450,000 based on the BINET Business's "failure to perform under the contract" with the Individual-2 Business.

i.   By on or about January 3, 2018, BINET Business Account-1 had a negative account balance.  In addition to the transactions discussed above, the approximately $450,000 that had been transferred to BINET Business Account-1 on or about November 10, 2017, had been spent or transferred out of the BINET Business Account-1 through debit-card purchases, ATM withdrawals, and automobile lease payments, among other transactions.

j.   On or about February 9, 2018, approximately $75,000 was wired from MARKOWITZ Business Account-1 to the Individual-2 Business as a partial refund of the approximately $450,000.  To date, no additional amounts have been refunded.

12.   Based on audio recordings of phone conversations recorded by Individual-2 at the request of law enforcement, I have learned, among other things, the following:

a.   On or about July 13, 2018, Individual-2 asked DAVID BINET, the defendant, "[w]hat happened to the

9

175,000,"[3] i.e., the approximately $175,000 portion of the approximately $450,000 wire transfer to BINET Business Account-1 that had not been transferred to MARKOWITZ Business Account-1. BINET responded, "We'll get it. We'll get it back to you one of these deals. Just was, we couldn't close any deals since then, but now it seems we have the right program, and once we close the first of two deals the money will come right back to you." As discussed in paragraphs 14 and 15 below, however, BINET had completed a transaction with another victim in or about March 2018.

         b.   On or about July 16, 2018, Individual-2 spoke by phone with MICHAEL SOLOMON MARKOWITZ, a/k/a "Sol," the defendant, and BINET. During the call, MARKOWITZ discussed the portion of the approximately $450,000 that the MARKOWITZ Business had received from the BINET Business, i.e., the approximately $275,000 wired from BINET Business Account-1 to MARKOWITZ Business Account-1 on or about November 14, 2017. MARKOWITZ told Indiviudal-2 that he had sent those funds to someone else in order to obtain an SBLC, and the money was never returned. MARKOWITZ stated, "If we got the money back, we wouldn't be, we wouldn't even be having this discussion." Individual-2 asked, "So what, did he just run off with the money, or what?" MARKOWITZ replied, "Well, it's a, it's a little more complicated than that. But he's involved with some litigation and everything got tied up, and that's really where the problem comes in." During that same call, MARKOWITZ, BINET, and Individual-2 discussed a potential new deal in which the Individual-2 Business would obtain a bank guarantee or SBLC. MARKOWITZ stated that in order to obtain the bank guarantee or SBLC in the desired amount, the Individual-2 Business would need to provide an additional advance fee of approximately $300,000.

         c.   On or about July 26, 2018, Individual-2 again spoke with MARKOWITZ and BINET on a conference call. During the call, MARKOWITZ stated that he had transferred all of the approximately $275,000 that the MARKOWITZ Business had received from the initial payment of approximately $450,000 to the other party in order to obtain an SBLC.

         13.  Based on bank records, I have learned, among other things, that the statements MICHAEL SOLOMON MARKOWITZ, a/k/a "Sol," the defendant, made to Individual-2 on or about July 18 and July 26, 2018, were false. The approximately

---

[3] All transcripts of recorded calls quoted herein are preliminary.

10

$275,000 that had been wired to MARKOWITZ Business Account-1 on
or about November 14, 2017, had not been transferred in full to
anyone else.  Rather, the funds were used to, among other
things, pay back others who had sent money to the MARKOWITZ
Business; transfer approximately $40,000 to accounts affiliated
with MARKOWITZ himself; and make cash withdrawals totaling
approximately $9,000.

### Transactions with Advance-Fee Victim-3

14.  Based on interviews with an individual
("Individual-4") associated with a particular business
("Advance-Fee Victim-3") and an individual ("Individual-5")
associated with a different business (the "Individual-5
Business"), as well as bank records, phone records, documents
and text messages provided by Individual-4, and email
communications obtained pursuant to Email Search Warrant-1, I
have learned, among other things, the following:

a.  In or about November 2017, Individual-4 met
ULYSSES SMITH, a/k/a "Malick," the defendant, and told SMITH
that Advance-Fee Victim-3 was seeking financing for a project.
In response, SMITH recommended that Individual-4 contact DAVID
BINET, the defendant, for assistance.

b.  On or about March 6, 2018, Advance-Fee
Victim-3 entered into a contract with the BINET Business in
which Advance-Fee Victim-3 agreed to give the BINET Business an
advance fee in exchange for assistance in obtaining a $100
million SBLC.  The agreement provided, among other things, that
if the BINET Business was unable to obtain an SBLC within 30
days, then the advance payment would be returned to Advance-Fee
Victim-3 within two weeks after that period.  On or about March
15, 2018, Individual-4 sent BINET an amended agreement and asked
BINET to sign it on the BINET Business's behalf.

c.  On or about March 16, 2018, Individual-5
wired a total of approximately $175,000 to BINET Business
Account-1 on Advance-Fee Victim-3's behalf.  BINET sent
Individual-5 an email confirming that the funds had arrived.
That same day, BINET wired approximately $5,000 from BINET
Business Account-1 to an account held by SMITH, and an
additional approximately $15,000 from BINET Business Account-1
to an account held by the SMITH Business.

d.  Subsequently, BINET told Individual-4 that
the BINET Business had sent the approximately $175,000 to
individuals in London in order to obtain an SBLC.  In truth,

11

however, bank records show that the $175,000 was not sent to any
one account, but rather was drained over time from BINET
Business Account-1 through a variety of payments and
expenditures, including the wire transfers to SMITH and the
SMITH Business discussed above, and car lease payments, utility
payments, and ATM withdraws, among other transactions.

        e.     No SBLC was provided to Advance-Fee Victim-
3.  Accordingly, in or about May 2018, Individual-4 demanded a
refund of the approximately $175,000 that had been wired to
BINET Business Account-1 on or about March 16, 2018.

        f.     On or about May 23, 2018, BINET wired
approximately $50,000 from BINET Business Account-1 to an
account held by the Individual-5 Business as a partial refund of
the approximately $175,000 advance fee.

        g.     On or about July 9, 2018, BINET told
Individual-4 by phone that the $175,000 that BINET Business
Account-1 had sent to individuals in London had been returned to
BINET Business Account-1, and that BINET would therefore refund
the entire fee by the end of the day.  In fact, however, bank
records show that no funds were wired to BINET Business Account-
1 on or around that date, other than a transaction crediting
approximately $31.95 to BINET Business Account-1 on or about
July 9, 2018.  Moreover, as of on or about July 9, 2018, BINET
Business Account-1 held a balance of only approximately $23,099.

        h.     BINET did not send any additional refund
until on or about July 12, 2018, when he wired approximately
$5,000 from BINET Business Account-1 to an account held by the
Individual-5 Business.

        i.     On or about July 23, 2018, BINET told
Individual-4 that BINET was going to Montreal, Canada, to speak
with the individuals from London he claimed had received the
approximately $175,000.  On or about July 24, 2018, BINET told
Individual-4 that BINET was driving back from Montreal to
Brooklyn, New York.  That same day, BINET sent Individual-4 a
text message stating that BINET was "[o]n the road back to
Brooklyn."  However, based on information provided by United
States Custom and Border Protection ("CBP"), I have learned,
among other things, that CBP has no record of BINET entering or
leaving the United States on or about July 23 or 24, 2018.

        j.     As of May 17, 2019, BINET and the BINET
Business had provided neither the promised SBLC nor a full
refund of the $175,000 advance fee.

                            12

## Discussions Regarding Advance-Fee Victim-4

15. On or about September 24, 2018, the Honorable Gregory H. Woods, United States District Judge, Southern District of New York, authorized the interception of wire occurring over a phone used by DAVID BINET, the defendant. Based on communications intercepted pursuant to that order, I have learned, among other things, the following:

a. On or about September 30, 2018, BINET and ULYSSES SMITH, a/k/a "Malick," the defendant, spoke by phone about a potential transaction in which an individual ("Advance-Fee Victim-4") would pay an advance fee in exchange for an SBLC. During the call, BINET stated, "I just wanted to update you in case he calls you. Uh. He called me on Friday, the guy from Nigeria . . . . So anyways, [u/i] he wants to do a $25 million SBLC and then go to the next level. So I'll send him, I'll email you the draft I sent him in case he calls you so I told him he has to put down $250,000 to get 1 percent of the instrument like the other day when we spoke while he's here. So he's OK with that, so I've just sent him a typical, just a preliminary draft of the agreement so he knows what it is." Based on my training, experience, and participation in this investigation, I believe that BINET was telling SMITH about Advanced Fee Victim-4, who was told that an advanced payment of $250,000 was required to obtain a $25 million SBLC.

b. On or about October 8, 2018, BINET and SMITH spoke by phone. During the call, SMITH asked, "Have you talked to this man from Africa?" BINET responded, "Yes, I spoke to him this morning," and added, "So what I understood from him, he's afraid of the risk. So I think he said he has 50 that will take a risk. If I push him to a hundred, then we'll give him part of the 760[4] that we are getting now. . . . So we'll give him part of this 760 we are getting now from Sol, that will be great." SMITH asked, "What did you say the guy from Africa is afraid of?" to which BINET responded, "He's afraid of the risks, cause originally we wanted 250 from him, for a 25M instrument. And he's afraid it too risky for him. . . . I can push him up to 75, give him part of the new, the instrument getting now from Sol, I don't [unintelligible] everything to [Individual-4]. I could play both of them, and then we get another one." Based on

---

[4] Based on my training, experience, and participation in this investigation, I believe that "760" refers to a SWIFT MT 760, which is a type of bank-to-bank communication pertaining to letters of credit.

13

my training, experience, and participation in this investigation, I believe that BINET informed SMITH that Advance-Fee Victim-4 was worried about the risk of providing $250,000 for an SBLC, but he was willing to pay $50,000 toward an SBLC.

           c.    On or about October 12, 2018, BINET and SMITH spoke by phone. During the call, SMITH said, "So he was saying, he can only, OK, he's saying, if he came up with a 100, could he get 10. I said, 'We gotta call David.' Now, listen to this: He wants me to put up 50. So, he says he's got 50, so I'm telling you what he's got, OK?" SMITH added, "So you can go from there. And don't, um. You have him talk to me. Just if he says, you know, can you, he put up a 100 and get 10, you tell him yes, and then that way you know you can do that, you know, you can do that, [u/i] right?" BINET responded, "Correct," and SMITH stated, "And then he'll come back to me, and I'll tell him I'm giving you the 5-0. OK?" BINET responded, "Perfect. That's a smart idea. Perfect." Based on my training, experience, and participation in this investigation, I believe that during this call SMITH was explaining that he had told Advance-Fee Victim-4 that SMITH would put up approximately $50,000 of a $100,000 advance fee in exchange for a promised letter of credit in the amount of $10 million ("he wants to put up 50"; "Just if he says, you know, can you, he put up a 100 and get 10, you tell him yes"; "I'll tell him I'm giving you the 5-0"), a plan that BINET called "Perfect" and "a smart idea."

## Transactions with CW-1

        16.    Based on interviews with a co-conspirator not named as a defendant herein ("CW-1"),[5] I have learned, among other things, the following:

---

[5] CW-1 was arrested in connection with his participation in the bank and wire fraud schemes described herein. Since his arrest, CW-1 has been cooperating with law enforcement in hopes of obtaining leniency. The information provided by CW-1 has proven to be reliable and has been corroborated by other evidence, including statements of other witnesses, audio recordings, and email communications. During the course of his participation in the advanced fee scheme, CW-1 represented to a United States District Judge that he was lawfully entitled to certain funds at issue in a civil case arising from his participation in the fraudulent advance fee scheme. Following his arrest, and as part of his ongoing cooperation, CW-1 has clarified to the Government

a.      Since in or about 2009, CW-1 has
participated in multiple fraud schemes, including schemes
involving fraudulent SBLCs and proof-of-fund letters, i.e.,
letters verifying that someone has a specified amount of funds
in an account at a particular financial institution.   Together
with co-conspirators, CW-1 has prepared fraudulent SBLCs and
proof-of-fund letters on letterhead of purported financial
institutions, and provided those letters to Advance-Fee Victims
and Bank Victims.

b.      Since at least in or about 2014, CW-1 and
MICHAEL SOLOMON MARKOWITZ, a/k/a "Sol," the defendant, have
worked together on numerous transactions in which CW-1, at
MARKOWITZ's direction, prepared fraudulent SBLCs or proof-of-
funds letters to be provided to Advance-Fee Victims and Bank
Victims.

17.     From in or about April 2019 to in or about July
2019, CW-1, at the direction and under the supervision of law
enforcement, communicated regularly with MICHAEL SOLOMON
MARKOWITZ, a/k/a "Sol," the defendant, by phone and email.
Based on recorded phone conversations and email communications,
as well as interviews with CW-1, I have learned, among other
things, the following:

a.      In or about 2019, MARKOWITZ notified CW-1
that an individual ("Individual-6") requested MARKOWITZ's
assistance in obtaining an SBLC for Individual-6's client
("Advance-Fee Victim-5") in exchange for an advance fee.
MARKOWITZ and CW-1 agreed that CW-1 would prepare a purported $5
million SBLC from an entity that was falsely purported to be
incorporated in Switzerland and registered in CW-1's name, but
that was not in fact a financial institution ("Fake Financial
Institution-1").

b.      CW-1 did so, preparing a purported SBLC from
Fake Financial Institution-1 on behalf of one if its clients,
who was in fact a fictional individual ("Fake Client-1") CW-1
and MARKOWITZ had listed on previous fraudulent bank
instruments.   The document listed the "RECEIVER" of the SBLC as
a financial institution ("Bank Victim-1")[6] with an address in New

that he was not lawfully entitled to the funds at issue in the
civil case.
[6] Based on a database available on the Federal Deposit Insurance
Corporation's website, I am aware that at the time of these

15

York, New York. The document stated that Fake Financial
Institution-1 was issuing "WITH FULL BANK RESPONSIBILITY OUR
FULLY CASH BACKED, IRREVOCABLE, UNCONDITIONAL, TRANSFERABLE,
DIVISIBLE, ASSIGNABLE AND CONFIRMED BY ISSUING BANK STAND BY
LETTER OF CREDIT . . . [IN] THE SUM OF FIVE MILLION US DOLLARS
(5,000,000.00) IN THE LAWFUL CURRENCY OF THE UNITED STATES OF
AMERICA, UPON PRESENTATION AND SURRENDER OF THIS STAND BY LETTER
OF CREDIT AT THE COUNTERS OF THE ISSUING BANK." The bottom of
the document listed CW-1's name and identified CW-1 as "PRIVATE
CLIENTS MANAGER" at Fake Financial Institution-1, with an
address in Switzerland.

      c.   On or about May 23, 2019, MARKOWITZ
forwarded Individual-6 an email stating that the SBLC had been
transmitted to Bank Victim-1.

      d.   On or about May 24, 2019, Individual-6
notified MARKOWITZ and CW-1 by email that Bank Victim-1 never
received the SBLC.

      e.   On or about May 31, 2019, at MARKOWITZ's
direction, CW-1 sent a hard copy of the purported SBLC to
Advance-Fee Victim-5 at an address in New York, New York.

      f.   On or about June 3, 2019, Individual-6 sent
an email copying MARKOWITZ and CW-1 requesting that CW-1 contact
Bank Victim-1 to inquire about the status of the SBLC.
Subsequently, MARKOWITZ and CW-1 talked by phone about what to
say during a potential call with Bank Victim-1. They agreed
that CW-1 would pose as a bank officer of Fake Financial
Institution-1; MARKOWITZ stated, "You can play the part that
you're an officer." MARKOWITZ also noted the possibility that
Bank Victim-1 would "want to know who [Fake Client-1] is." In
that scenario, MARKOWITZ said, "[Fake Client-1] is a client of
the bank. You understand? Uh, that, that you have no problem
to say, I assume."

      g.   Later that day, MARKOWITZ and CW-1 again
talked by phone about what to say during a potential call with
Bank Victim-1. During the call, CW-1 asked MARKOWITZ, "What do
I do if they ask me if it's cash-backed?"--i.e., how should CW-1
respond if Bank Victim-1 asked whether the purported $5 million
SBLC from Fake Financial Institution-1 on behalf of Fake Client-
1 was secured by $5 million in cash. MARKOWITZ stated, "Yeah,

---

events, deposits of Bank Victim-1 were insured by the Federal
Deposit Insurance Corporation.

16

you know, there's, there's assets covering the SBLC." CW-1 responded, "So is that what you want me to [u/i]--I don't know what to say, because, you know"--at which point MARKOWITZ stated, "Right, I know, I know, but you can't say that the guy has cash cuz the next thing is they can ask you for a balance sheet or something. Right? And we both know you can't do that, you're not going to do that." Later in the call, CW-1 asked MARKOWITZ, "Anything else you can think of that they might ask me?" MARKOWITZ replied, "'Are, are, is it 100 percent collateralized?' You can say, 'Yes.' Now if they ask the word 'cash' collateral, that's something you have to check with your superiors, I would say. But you are collateralized. . . . Tell them as far as you know it's 100 percent collateralized. . . . Cause otherwise, you know, you can't say 'No' because then they wouldn't have a right to issue the instrument. . . . If they put the word 'cash' in your mouth, then you have to say you have to check with your superiors, but you are collateralized. That's the way I would play it."

h.  On or about June 5, 2019, MARKOWITZ and CW-1 again talked by phone about what to say during a potential call with Bank Victim-1. They agreed that MARKOWITZ would be on the call, and that CW-1 would introduce MARKOWITZ to Bank Victim-1 as "another bank officer."

i.  Later that day, MARKOWITZ and CW-1 spoke by phone with a Bank Victim-1 representative located at a branch in New York, New York. During the call, CW-1 introduced CW-1 and MARKOWITZ as employees of Fake Financial Institution-1. The Bank Victim-1 representative stated that Advance-Fee Victim-5 had visited the bank, inquired about the purported $5 million SBLC issued by Fake Financial Institution-1 and why, given the SBLC, Bank Victim-1 had not deposited funds into Advance-Fee Victim-5's account.

j.  On or about June 12, 2019, MARKOWITZ and CW-1 spoke by phone about providing Advance-Fee Victim-5 with two additional SBLCs to be provided to a different financial institution ("Bank Victim-2"),[7] which MARKOWITZ said would accept an SBLC in hard copy. During the call, MARKOWITZ proposed that

---

[7] Based on a database available on the Federal Deposit Insurance Corporation's website, I am aware that at the time of these events, deposits of Bank Victim-2 were insured by the Federal Deposit Insurance Corporation.

17

CW-1 create two SBLCs purportedly issued by Fake Financial Institution-1.

k. Later that day, MARKOWITZ sent CW-1 an email attaching two Microsoft Word documents. The email stated, "ENCLOSED ARE THE TWO DRAFTS THAT WILL BE GOING BY HARD COPY ONLY." The attachments contained draft language for the purported $25 million and $5 million SBLCs. Each document listed the "RECEIVER" of the SBLC as Bank Victim-2, and stated that Fake Financial Institution-1 was issuing a "CASH BACKED" SBLC on behalf of Fake Client-1.

l. Later that day, MARKOWITZ and CW-1 spoke by phone about the drafts MARKOWITZ had sent CW-1. During the call, CW-1 stated, "I looked at both of these, and my question to you is, look, we both know that [Fake Client-1] is made up." MARKOWITZ responded, "Right," and CW-1 continued, "And we're using it on the same, we're using [Fake Client-1] twice, on the same, the same, you know, the same client. Would you like me to get you somebody else? You know I don't want [Fake Financial Institution-1] to end up on the blacklist somehow." MARKOWITZ responded, "I don't care if you use the applicant as somebody else," and later added, "If you want to use another name besides [Fake Client-1], I don't care, but technically it should come from Switzerland."

m. Later that day, CW-1 sent MARKOWITZ an email attaching two Microsoft Word documents containing substantially the same language as the documents MARKOWITZ had emailed to CW-1, except that the text was now on Fake Financial Institution-1 letterhead and the SBLCs stated that they were issued on behalf of a different client ("Fake Client-2"). CW-1's cover email to MARKOWITZ noted the replacement of Fake Client-1's name, stating, "Sol, Attached you will find both drafts. I made no changes other than the name. I installed a new fictional character. I hope you like it."

18

      n. On or about June 18, 2019, at MARKOWITZ's direction, CW-1 sent hard copies of the two purported SBLCs, which stated that they were issued on behalf of Fake Client-2, to Bank Victim-2.

     WHEREFORE, deponent prays that arrest warrants be issued for MICHAEL SOLOMON MARKOWITZ, a/k/a "Sol," DAVID BINET, and ULYSSES SMITH, a/k/a "Malick," the defendants, and that they be arrested and imprisoned or bailed, as the case may be.

NICHOLAS J. SWANSON
Special Agent
Federal Bureau of Investigation

Sworn to before me this
_9_ th day of August, 2019

HONORABLE DEBRA FREEMAN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

19